The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader.  The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
February 22, 2018

## 2018COA21

## No. 16CA817, Dorsey & Whitney LLP v. RegScan, Inc. — Attorney Fees — Due Process — Jurisdiction of Courts — Long-arm Statute — Personal Jurisdiction

In a case involving a dispute between a law firm and its client
over unpaid legal fees, a division of the court of appeals considers
whether the district court had specific personal jurisdiction over the
nonresident client.  The client reached out to and retained a specific
Colorado attorney in the law firm to represent it in a matter
ultimately filed in another state.  In the course of the
representation, the client communicated almost daily with the law
firm in Colorado, and paid the law firm's retainer in Colorado.  The
division concludes that the district court had specific personal
jurisdiction over the nonresident client.

The division also rejects the client's contentions that the district court erred under CRE 703 when it allowed the law firm's expert to testify about billing records not admitted into evidence, that the district court erred by failing to include a fairness element in the elemental breach of contract jury instruction, and that the district court improperly relied on CRE 408 to exclude evidence that the client objected to the amounts the law firm had charged.

Accordingly, the division affirms the judgment of the district court.

COLORADO COURT OF APPEALS    **2018COA21**

Court of Appeals No. 16CA0817
City and County of Denver District Court No. 14CV34542
Honorable Karen L. Brody, Judge
Honorable Elizabeth A. Starrs, Judge

Dorsey & Whitney LLP,

Plaintiff-Appellee,

v.

RegScan, Inc.,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division IV
Opinion by JUDGE J. JONES
Hawthorne and Richman, JJ., concur

Announced February 22, 2018

Dorsey & Whitney LLP, Scott P. Sinor, Andrea Ahn Wechter, Denver, Colorado, for Plaintiff-Appellee

Johnson & Klein, PLLC, Eric K. Klein, Boulder, Colorado, for Defendant-Appellant

¶ 1     This case involves a dispute between a law firm and its client over unpaid legal fees.  The client, RegScan, Inc., a Pennsylvania-based internet company that assists companies with environmental, health, and safety regulations, appeals the $373,707.43 judgment against it and in favor of the law firm of Dorsey & Whitney LLP (the law firm).  Among the issues we address is whether the district court had personal jurisdiction over the nonresident client, an issue which turns on application of relatively well-settled principles to a set of facts that isn't all that uncommon.  In the end, we conclude that the court had jurisdiction.  Addressing as many of RegScan's other contentions as we need to, including an issue of first impression about the meaning of CRE 703, we affirm.

## I.     Background

¶ 2     BNA, a competitor of RegScan, began marketing a product to which RegScan believed it had exclusive rights.  So Edward Ertel, RegScan's president and CEO, called his close friend and former college roommate, Greg Tamkin, a partner in the law firm's Denver office who specializes in intellectual property matters.  After they discussed the situation, RegScan hired the law firm.  The parties' engagement letter limited the scope of the law firm's representation

to pre-litigation work. But once it became clear that RegScan would have to take BNA to court to vindicate its perceived rights, Mr. Ertel and Mr. Tamkin agreed that the law firm would represent RegScan in that litigation. Mr. Tamkin sent Mr. Ertel an email confirming their modification of the earlier agreement, and Mr. Ertel sent a $25,000 retainer to the law firm's Denver office.

¶ 3     The law firm filed the BNA case in the United States District Court for the Eastern District of Virginia. Throughout the litigation, Mr. Ertel had frequent, almost daily, conversations with attorneys in the law firm's Denver office via telephone and email. Each month, the law firm sent detailed bills to RegScan, charging time in tenth-of-an-hour increments.

¶ 4     While RegScan didn't specifically question the legitimacy of the hours worked or the billed hourly rates, it eventually complained to Mr. Tamkin that the litigation costs were exceeding his estimates. According to RegScan, Mr. Tamkin had estimated that the total cost of the representation would be between $300,000 and $400,000 dollars. The law firm ultimately billed RegScan a total of $769,894.71, of which RegScan paid $371,187.28.

¶ 5       Through a series of emails, the parties attempted to negotiate a resolution.  But they couldn't reach an agreement, and the law firm sued RegScan in Denver District Court for the claimed outstanding balance, asserting claims for breach of contract and account-stated.[1]  A jury found in the law firm's favor on both claims, awarding damages of $398,707.43, less $25,000, the amount of the retainer RegScan had already paid.[2]

## II.    Discussion

¶ 6       RegScan raises half a dozen contentions on appeal: (1) the court didn't have personal jurisdiction over RegScan; (2) the law firm's expert witness shouldn't have been allowed to testify about billing records not admitted into evidence; (3) the elemental breach of contract jury instruction omitted an element of the claim; (4) the

---

[1] "An account stated is an agreement that the balance and all items of an account representing the previous monetary transactions of the parties thereto are correct, together with a promise to pay such balance." *Mace v. Spaulding,* 110 Colo. 58, 59, 130 P.2d 89, 89 (1942) (citation omitted).

[2] The verdict form posed four questions to the jurors: (1) whether RegScan breached a contract; (2) whether the law firm had proved there was an account stated; (3) *if they found for the law firm on either question 1 or 2,* what damages RegScan owes; and (4) again if they found for the law firm on either claim, whether the retainer should be deducted from the damages.

elemental account-stated jury instruction omitted an element of the claim; (5) the district court improperly excluded evidence under CRE 408 of RegScan's objections to the amount the law firm had charged; and (6) the district court erred by denying RegScan's motion for a directed verdict on the account-stated claim.

¶ 7 We first conclude that the district court had personal jurisdiction over RegScan. We then reject RegScan's other contentions potentially affecting the jury's verdict on the breach of contract claim. And because we affirm as to the breach of contract claim, and the jury awarded the same damages on both claims, we don't address RegScan's contentions pertaining exclusively to the account-stated claim.

### A. The District Court had Specific Personal Jurisdiction Over RegScan

¶ 8 We conclude that the district court had specific personal jurisdiction over RegScan based on RegScan's course of dealing with the law firm.

#### 1. Preservation and Standard of Review

¶ 9 Early on in the case, RegScan filed a motion to dismiss for lack of personal jurisdiction. The district court denied that motion

4

in a thorough, written order. RegScan renewed its motion at the close of evidence and the court again denied it. Thus, RegScan preserved the issue.

¶ 10 Whether a court may exercise personal jurisdiction over a particular defendant presents a question of law that we review de novo. *Griffith v. SSC Pueblo Belmont Operating Co. LLC*, 2016 CO 60M, ¶ 9. Because RegScan renewed its motion at trial, the law firm was required to establish personal jurisdiction by a preponderance of the evidence. *Goettman v. N. Fork Valley Rest.*, 176 P.3d 60, 66 n.3 (Colo. 2007); *Archangel Diamond Corp v. Lukoil*, 123 P.3d 1187, 1192 n.3 (Colo. 2005).[3]

---

[3] The Colorado Supreme Court hasn't yet opined on what standard an appellate court uses to review any findings of historical fact underlying a district court's ultimate conclusion regarding jurisdiction. But other courts review such findings for clear error. *See, e.g.*, *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir. 1986); *O'Bryan v. McDonald*, 952 P.2d 636, 638 (Wyo. 1998). The district court didn't make any express factual findings in denying RegScan's motion at trial, and in ruling on RegScan's pretrial motion to dismiss the court relied on the parties' submissions; it didn't conduct an evidentiary hearing. No matter. The historical facts relevant to our jurisdictional inquiry don't appear to be disputed.

## 2. Requirements for Personal Jurisdiction

¶ 11 Colorado's long-arm statute confers jurisdiction over a cause of action arising from "[t]he transaction of any business within this state" to the maximum extent permitted by the Due Process Clauses of the United States and Colorado Constitutions. § 13-1-124(1)(a), C.R.S. 2017; *Magill v. Ford Motor Co.*, 2016 CO 57, ¶ 14; *Archangel Diamond Corp.*, 123 P.3d at 1193. This constitutional overlay means that a plaintiff desiring to invoke a Colorado court's jurisdiction over a nonresident defendant must show that doing so comports with the long-arm statute and due process. *Archangel Diamond Corp.*, 123 P.3d at 1193. The result is a two-step process. First, the plaintiff must show that the defendant has sufficient minimum contacts with Colorado such that the defendant should reasonably have foreseen being haled into court here. *Id.* at 1194; *Keefe v. Kirschenbaum & Kirschenbaum, P.C.*, 40 P.3d 1267, 1270 (Colo. 2002). And second, the plaintiff must show in addition to such minimum contacts that requiring the defendant to litigate in Colorado doesn't offend traditional notions of fair play and substantial justice. *Align Corp. Ltd. v. Boustred*, 2017 CO 103, ¶¶ 10, 13; *Keefe*, 40 P.3d at 1271.

¶ 12    Given the nature of RegScan's arguments regarding jurisdiction, further explanation of these two requirements is warranted.

### a.    Minimum Contacts

¶ 13    "The quantity and nature of the minimum contacts required depends on whether the plaintiff alleges specific or general jurisdiction." *Archangel Diamond Corp.*, 123 P.3d at 1194. The law firm hasn't ever claimed that RegScan is subject to general jurisdiction — that is, jurisdiction based on contacts unrelated to the events giving rise to the case — in Colorado. *See id.* Rather, it claims specific jurisdiction. This form of minimum contacts exists when the injuries precipitating the case arose out of and are related to "activities that are significant and purposefully directed by the defendant at residents of the forum." *Align Corp.*, ¶ 11 (ultimately quoting *Keefe*, 40 P.3d at 1271); *see Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985). Put another way, we must assess "(1) whether the defendant purposefully availed [itself] of the privilege of conducting business in the forum state, and (2), whether the litigation 'arises out of' the defendant's forum-related contacts." *Archangel Diamond Corp.*, 123 P.3d at 1194.

¶ 14    Whether the purposeful availment requirement is met depends on the defendant's actions, not on those unilaterally taken by someone else.  This limitation is necessary to assure that exercising jurisdiction doesn't result from "'random,' 'fortuitous,' or 'attenuated' contacts."  *Burger King Corp.*, 471 U.S. at 475 (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984)); *Archangel Diamond Corp.*, 123 P.3d at 1194; *Keefe*, 40 P.3d at 1270-71.  However, a single act may be sufficient to establish specific jurisdiction, *Goettman*, 176 P.3d at 69, including, in some cases, the "defendant's deliberate creation of 'continuing obligations' with the forum state," *Archangel Diamond Corp.*, 123 P.3d at 1194 (quoting *Keefe*, 40 P.3d at 1271).  "The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects [it] to the forum in a meaningful way."  *Walden v. Fiore*, 571 U.S. ___, ___, 134 S. Ct. 1115, 1125 (2014).

¶ 15    The "arising out of" requirement means that the defendant created a "substantial connection" with the forum state through the actions that gave rise to the case.  *Align Corp.*, ¶ 12; *Archangel*

8

*Diamond Corp.*, 123 P.3d at 1194; *Giduck v. Niblett*, 2014 COA 86, ¶ 16.

### b. Fair Play and Substantial Justice

¶ 16 Even if the plaintiff shows sufficient minimum contacts, a court shouldn't exercise personal jurisdiction over a nonresident defendant unless doing so would comport with traditional notions of fair play and substantial justice. This inquiry turns on factors such as (1) the burden that litigation in the forum state would impose on the defendant; (2) the forum state's interest in resolving the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in the efficient resolution of cases; and (5) the states' shared interest in furthering substantive social policies. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980); *Youngquist Bros. Oil & Gas, Inc. v. Miner*, 2017 CO 11, ¶ 13; *Align Corp.*, ¶ 13; *Archangel Diamond Corp.*, 123 P.3d at 1195; *Keefe*, 40 P.3d at 1271-72. A defendant which has purposely directed its activities at forum residents must present a compelling case that some other consideration would render the court's exercise of jurisdiction unreasonable. *Keefe*, 40 P.3d at 1272.

### 3. Analysis

#### a. Minimum Contacts

¶ 17    Though RegScan doesn't contest that its conduct giving rise to this litigation is "substantially connected" to Colorado — as required by the second prong of the specific jurisdiction minimum contacts analysis — it does argue that its actions connecting it to Colorado are too attenuated to demonstrate purposeful availment because it merely contracted with a Minnesota-based law firm which happened to staff the case (filed in Virginia) with Colorado attorneys.

¶ 18    We aren't persuaded by RegScan's arguments.  In our view, the record amply supports the conclusion that RegScan had sufficient contacts with Colorado that it reasonably could've expected to be haled into court here.[4]  To wit:

---

[4] Contrary to RegScan's suggestion, the law firm isn't relying on its own connections to Colorado to establish jurisdiction. *Cf. Giduck v. Niblett*, 2014 COA 86, ¶¶ 22-24 (the plaintiffs' reliance on their own Colorado residence was misguided where they failed to (1) allege that the defendants' tortious online statements were specifically directed at Colorado; (2) show that the defendants formed any contact with Colorado; or (3) show that the defendants contacted or directed their statements to specific individuals, customers, or potential customers in Colorado).

- RegScan deliberately reached out to and solicited an attorney-client relationship with a Colorado attorney, based on that attorney's writing ability, expertise, and relationship to Mr. Ertel.

- RegScan entered into an attorney-client relationship leading to continuing obligations by both parties in the state of Colorado while knowing that Colorado attorneys would provide most, if not all, of the services for which it was contracting. (Colorado attorneys performed most (70%) of the work, and Mr. Tamkin did almost all of the work during the pre-litigation phase.)

- Mr. Tamkin executed the written fee agreement, showing his and the law firm's contact information and address in Colorado, and sent it to Mr. Ertel. Mr. Ertel signed it and returned it to Mr. Tamkin in Colorado.

- RegScan sought legal counsel who would charge lower rates than those charged by Washington, D.C., attorneys. By hiring Mr. Tamkin and his firm, RegScan knew it would pay such lower rates.

- RegScan communicated extensively, almost daily, via email and telephone with Colorado attorneys in Colorado. Mr. Ertel initiated many of those communications.

- RegScan paid the retainer in Colorado. It made out the retainer check to "Dorsey & Whitney, LLP, Gregory S. Tamkin, 1400 Wewatta Street, Suite 400, Denver, CO 80202-5549."

¶ 19    "Considered in isolation, these contacts with Colorado might not be sufficient to establish specific jurisdiction." *Rome v. Reyes*, 2017 COA 84, ¶ 25. But considering them in their totality, as we must, *see id.*, they are sufficient. *Cf. Keefe*, 40 P.3d at 1272 (Colorado court had personal jurisdiction over a New York attorney where that attorney represented a Colorado resident in a New York suit and that resident sued for malpractice in Colorado because "[d]ue process . . . requires only fair warning to the defendants that they could be subject to the specific jurisdiction of the Colorado courts relating to those activities"); *Waterval v. Dist. Court*, 620 P.2d 5, 10 (Colo. 1980) (personal jurisdiction existed based on several factors, including a professional relationship that involved extensive communications between a nonresident and resident of Colorado by email and telephone).

12

¶ 20    The facts of this case are remarkably similar to those in

*Fischbarg v. Doucet*, 880 N.E.2d 22 (N.Y. 2007), whose reasoning we

find persuasive.  Residents of California (an individual and a

corporation) retained a New York attorney to represent the

corporation in an Oregon lawsuit.  When the clients failed to pay

the attorney, he sued them in New York.  *Id.* at 24.  New York's

highest court held that the courts of that state had personal

jurisdiction over the defendants because the defendants had

"projected themselves into New York via telephone to solicit

plaintiff's legal services."  *Id.* at 30.  The defendants reached out to

the attorney and sent a letter to New York confirming the

arrangement.  The attorney worked from New York, and the

defendants communicated with him twice per week for nine months

via email, mail, and telephone.  *Id.* at 25.  The court deemed these

facts sufficient to establish purposeful availment of the benefits and

protections of New York laws.  *Id.* at 25-27.

¶ 21    In trying to distinguish *Fischbarg*, RegScan argues that it

hired the law firm (not a specific Colorado attorney) because of the

law firm's expertise in intellectual property, and its proximity and

connections to Washington, D.C.  But the evidence shows that

RegScan's CEO reached out to a particular Colorado attorney and knew that the work on the matter would be done chiefly by Colorado attorneys. And RegScan did so, at least in part, to receive the benefit of the lower rates the law firm's Colorado attorneys would charge.

¶ 22 Apparently in the alternative, RegScan argues, citing several cases from other jurisdictions, that all it did was retain a Colorado lawyer, and that alone doesn't subject it to personal jurisdiction in Colorado. But the cases on which RegScan primarily relies are distinguishable or unpersuasive.

¶ 23 In *Amins v. Life Support Medical Equipment Co.*, 373 F. Supp. 654 (E.D.N.Y. 1974), a client hired a New York attorney to act as a patent attorney in Massachusetts. The attorney sued the client for fees in New York. *Id.* at 656. The court ruled that even though the attorney did most of the work in New York and that the client had gone to New York to see the attorney, it lacked jurisdiction because there was no "purposeful resort by the [clients] to the protection of the laws of New York in one form or another." *Id.* at 657. But *Amins* applied New York law, *id.*, and was decided decades before

14

*Fischbarg.* In light of the New York Court of Appeals' decision in *Fischbarg*, *Amins* doesn't appear to be good law.

¶ 24     In *Hyatt v. Broyles, Dunstan & Dunstan, P.C.*, 400 S.E.2d 665 (Ga. Ct. App. 1990), a South Carolina resident hired an attorney who lived in Georgia but who was licensed in both Georgia and South Carolina to handle a matter in South Carolina. The parties entered into the agreement in South Carolina. *Id.* at 667. Though most of the work was done in Georgia, the court held that the location of the attorney's law office alone didn't confer personal jurisdiction over the client in Georgia: "purposeful acts must have been performed by the defendant to tie it to the State, and mere telephone or mail contact with an out-of-state defendant, or even the defendant's visits to this state [are] insufficient." *Id.* In so holding, however, the court relied on *Amins, id.*, a case of dubious continuing validity. And, as noted, the contract had been formed in another state.

¶ 25     *Schmidt v. JPS Industries, Inc.*, No. 1:09-CV-3584-JEC, 2011 WL 1262165 (N.D. Ga. Mar. 31, 2011), is clearly distinguishable. The defendant hired counsel for a case in Massachusetts, and the lawyer, not the defendant, then hired the plaintiff, a Georgia

resident, as an expert. It was therefore the attorney's acts, not the defendant-client's, that had created some connection with Georgia. So the Georgia court didn't have personal jurisdiction over the client.

¶ 26 In *Zavian v. Foudy*, 747 A.2d 764 (Md. Ct. Spec. App. 2000), an attorney brought an action against nonresident athletes to recover payment for serving as their agent for product endorsements. The court held that Maryland courts lacked personal jurisdiction over the defendants because the professional services the attorney rendered for the nonresidents "could have been conducted from any where." *Id.* at 770-71. Though the athletes contacted the lawyer "to obtain her professional services, it was because [the lawyer's] name appeared on a list of lawyers willing to perform such services for female athletes and not because she was a Maryland lawyer." *Id.* at 771. The court also emphasized that the parties didn't negotiate or execute the contract for services in Maryland. *Id.*

¶ 27 RegScan, in contrast, didn't simply pick a lawyer from a list of lawyers with intellectual property experience; its CEO purposefully chose Mr. Tamkin based on an existing relationship, knowing that

16

work on the matter would be done in Colorado, and knowing the rates RegScan would be charged would be lower than those charged by Washington, D.C., attorneys. Mr. Ertel directed numerous communications to Colorado to negotiate (and enter into) the fee agreement and the modification. And RegScan initiated numerous contacts with the law firm in Colorado and sent the retainer to the law firm in Colorado. Perhaps the services could've been performed somewhere else, but that fact alone doesn't defeat jurisdiction. *Cf. Jason Pharm., Inc. v. Jianas Bros. Packaging Co.*, 617 A.2d 1125, 1126-27, 1129 (Md. Ct. Spec. App. 1993) (Maryland court had personal jurisdiction over nonresident corporation where the corporation contacted a Maryland company about purchasing machines, negotiated with the Maryland company via numerous telephone calls, entered into a contract with the Maryland company, and sent payments to the Maryland company).

¶ 28     *Thompson Hine, LLP v. Taieb*, 734 F.3d 1187 (D.C. Cir. 2013), is similarly distinguishable. In that case, a Florida resident contracted with an Ohio law firm to represent him in a matter pending in Oregon. Attorneys with the law firm's District of Columbia office did much of the work. When the client failed to pay

17

the bill, the law firm sued him in the District of Columbia. In affirming the dismissal of the complaint for lack of personal jurisdiction, the court relied on the facts that the client hadn't sought to retain attorneys in the District of Columbia, the client had negotiated with one of the law firm's attorneys in Georgia, the matter was supervised by the Georgia lawyer, the client didn't develop any relationships with the District of Columbia attorneys, and there was no evidence of any communications between the client and the District of Columbia attorneys. *Id.* at 1188, 1191-92. Those facts are a far cry from the facts of this case.

¶ 29    In sum, we conclude that considering the totality of the circumstances, RegScan's purposeful activities directed at Colorado satisfy the minimum contacts requirement.

### b.    Fair Play and Substantial Justice

¶ 30    RegScan asserts that the burden of litigating in Colorado is so heavy as to make exercising personal jurisdiction over it in Colorado unreasonable. But this fee dispute case is not complex, discovery was very limited, and there were relatively few witnesses (only four testified at trial). The trial itself lasted less than three days. And though RegScan may not be a very large company, we note that it

has a few employees in several states, including as far west as Texas.

¶ 31    True, as RegScan points out, its only trial witness (Mr. Ertel) did have to fly to Colorado for one day of the trial, and weather apparently prevented one RegScan may-call witness from getting to Colorado to testify.  But we aren't persuaded that this burden was so severe as to violate RegScan's right to due process.  Such travel is frequently necessary when a court exercises jurisdiction over a nonresident defendant.  In this day and age, the limited amount of travel required in this case isn't likely to have been too onerous (or unusual) for this corporation.

¶ 32    RegScan doesn't argue that Colorado lacks an interest in resolving this dispute or that the law firm lacks a strong interest in litigating the case here.  Any such argument would be unavailing in light of the Colorado-centric nature of the agreement and the work performed, as well as the fact the law firm's witnesses live in Colorado.[5]

---

[5] The three law firm witnesses who testified live in Colorado.

¶ 33     The upshot is that we simply can't say that requiring RegScan to defend this case in Colorado is unreasonable.

¶ 34     For these reasons, we hold that the district court didn't err in denying RegScan's motion to dismiss for lack of personal jurisdiction.

## B.     The Expert's Testimony

¶ 35     RegScan next contends that the court erred by allowing the law firm's expert witness on the reasonableness of its fees, Neal Cohen, to testify to the substance of information in the pro forma bills (records reflecting the total number of hours worked), which the law firm didn't offer into evidence.  It argues that the testimony ran afoul of CRE 703.  We see no reversible error.

### 1.     Additional Background

¶ 36     When the law firm's counsel asked Mr. Cohen whether he had seen any differences between the draft bills and the invoices, he said, "In general, what I found was that the hours — I think the total number of hours in the *pro formas* were reduced by roughly fifteen percent in the invoices."  RegScan's attorney objected under CRE 703 on the basis the draft bills wouldn't be coming into evidence.  The court overruled the objection.  Mr. Cohen then

testified that, based on his review of the pro formas, the law firm's attorneys worked more hours than they ultimately billed:

> The total number of hours — it's called hours worked, these are the total number of hours that were reported in the pro formas — was 2442.9, 2,443. The information I received from Dorsey about the total hours that were billed was 2,098.65. So, the difference between the number of hours worked, and the number of hours reportedly billed was about a thirteen percent reduction [or about $100,000] from worked to billed.

¶ 37 He also testified that Dorsey discounted costs by 49% (about $50,000).

### 2. Preservation and Standard of Review

¶ 38 The parties disagree about whether RegScan preserved this issue. But because defense counsel likely preserved it when he made a Rule "703 objection to all of this potential testimony that relates to analysis that Mr. Cohen comparing *pro formas* against the invoices that *pro formas* are not coming into evidence," we'll assume that RegScan did so.

¶ 39 We review evidentiary rulings, including a ruling on the admissibility of expert testimony, for an abuse of discretion. *Genova v. Longs Peak Emergency Physicians, P.C.*, 72 P.3d 454, 458

(Colo. App. 2003). We review a preserved claim of error for harmless error, and therefore will reverse only if the error "substantially influenced the outcome of the case." *Id.* at 459.

### 3. Analysis

¶ 40 According to RegScan's opening brief, Mr. Cohen's testimony about the number of hours actually worked was inadmissible under CRE 703 because the *pro formas* "were never offered or introduced in evidence." But that argument misconstrues the rule.

Rule 703 provides as follows:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data *need not be admissible* in evidence in order for the opinion or inference to be admitted. *Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.*

(Emphasis added.)

¶ 41    The rule was substantially amended in 2002 to conform to

Fed. R. Evid. 703, which had been substantially amended in 2000.

As relevant, the rule allows an expert to base his opinion on facts or

data that wouldn't be admissible if such facts and data are of a type

on which experts in the field would reasonably rely.  But the expert

may not disclose those inadmissible facts and data to the jury

unless the court so allows after engaging in the balancing analysis

called for by the last sentence of the rule.  As structured, the rule

recognizes that experts frequently rely on inadmissible information

in forming their opinions, and their opinions shouldn't necessarily

be excluded on that basis alone.  On the other hand, a party

shouldn't be able to use an expert as a mere conduit for otherwise

inadmissible information (frequently, hearsay).  *See* Fed. R. Evid.

703 advisory committee's note to 2000 amendment; 1 George E. Dix

et al., *McCormick on Evidence* § 15, at 126-27 (Kenneth S. Broun

ed., 7th ed. 2013); 2 George E. Dix et al., *McCormick on Evidence*

§ 324.3, at 578-80 (Kenneth S. Broun ed., 7th ed. 2013); 3

Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence*

§ 7:16, at 864-68 (4th ed. 2013); *see also, e.g.*, *Marvel Characters,*

*Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013) (affirming exclusion

of expert reports that were largely a conduit for inadmissible hearsay); *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 666 (S.D.N.Y. 2007) (excluding expert testimony that was hearsay "not admissible under any hearsay exception").[6]

¶ 42    With this understanding of the rule in mind, it's easy to see where RegScan's argument goes astray: it equates "weren't admitted" with "otherwise inadmissible." "Otherwise inadmissible," however, refers to information that *can't* be admitted under the rules of evidence, not facts or data that simply *haven't been admitted*. *See, e.g.*, Fed. R. Evid. 703 advisory committee's note to 2000 amendment ("This amendment covers facts or data that *cannot be admitted* for any purpose other than to assist the jury to evaluate the expert's opinion. The balancing test provided in this amendment is not applicable to facts or data that are admissible for any other purpose but have not yet been offered for such a purpose at the time the expert testifies. The amendment provides a presumption against disclosure to the jury of information used as

---

[6] Fed. R. Evid. 703 is substantially similar to CRE 703. Therefore, authorities addressing the federal rule may be persuasive in applying the Colorado rule. *Stewart ex rel. Stewart v. Rice*, 47 P.3d 316, 321 (Colo. 2002); *Leaf v. Beihoffer*, 2014 COA 117, ¶ 29.

the basis of an expert's opinion and *not admissible* for any substantive purpose.") (emphasis added).

¶ 43     RegScan's objection to the testimony, therefore, wasn't a cognizable objection under CRE 703. Neither at trial nor in their opening brief on appeal did RegScan argue that the pro formas weren't *admissible*.[7]

¶ 44     In any event, we don't perceive any real prejudice to RegScan. Mr. Tamkin testified, without objection, as to the discounting of the bills, including the amount of time that the law firm had "written off." His testimony as to the amount — "around $100,000" — closely matched Mr. Cohen's. Thus, the substance of the expert testimony RegScan contests was already in evidence. Further, RegScan doesn't argue that Mr. Cohen's ultimate opinion as to the

---

[7] In its reply brief on appeal, RegScan argued for the first time that the information was otherwise inadmissible. That's too late. *See Estate of Stevenson v. Hollywood Bar & Cafe, Inc.*, 832 P.2d 718, 721 n.5 (Colo. 1992) ("Arguments never presented to, considered or ruled upon by a trial court may not be raised for the first time on appeal."); *In Interest of L.B.*, 2017 COA 5, ¶ 48 ("We do not consider arguments raised for the first time in a reply brief."). Had RegScan timely objected on this basis, the law firm may have been able to lay a foundation for admissibility of the documents, perhaps as records "kept in the regular course of business activity." *See* CRE 803(6) (the business records exception to the hearsay rule).

reasonableness of the fees, which was based on a host of unchallenged considerations, was inadmissible or even in any way wrong. So as we see it, RegScan's argument is much ado about very little.

## C. The Elemental Breach of Contract Jury Instruction

¶ 45 RegScan next contends the district court erred by failing to include a fairness element in the elemental breach of contract jury instruction. We conclude that any error was harmless.

### 1. Standard of Review

¶ 46 We review de novo whether a particular jury instruction correctly states the law. *Day v. Johnson*, 255 P.3d 1064, 1987 (Colo. 2011). But we review a district court's decision to give a particular jury instruction for an abuse of discretion. *Id.* Because RegScan preserved the issue, we will reverse only if any error affected RegScan's substantial rights. C.R.C.P. 61. That's the result only if the jury "probably would have decided [the] case differently if given a correct instruction." *Gasteazoro v. Catholic Health Initiatives Colo.*, 2014 COA 134, ¶ 12 (quoting *Harris Grp., Inc. v. Robinson*, 209 P.3d 1188, 1195 (Colo. App. 2009)).

## 2.     Analysis

¶ 47     The elements of a breach of contract claim — existence of a contract, breach of a material term of the contract, and (sometimes) performance of the contract by the plaintiff — are so well-established as to require no citation to authority.[8]  But RegScan tendered an elemental instruction adding two elements: "the contract was fair and reasonable under the circumstances" and "the services performed were reasonably worth the amounts billed." It relied on cases such as *Enyart v. Orr,* 78 Colo. 6, 13, 238 P. 29, 33 (1925), which address the requirements of a breach of contract claim in the attorney-client fee dispute context.  *See also Bryant v. Hand,* 158 Colo. 56, 59, 404 P.2d 521, 523 (1965); *Rupp v. Cool,* 147 Colo. 18, 22, 362 P.2d 396, 398 (1961).  The district court gave the jury an elemental instruction that included the second of these additional elements, but not the first.

¶ 48     RegScan now argues that the court erred in failing to instruct the jury that the law firm had to prove that the contract was fair and reasonable under the circumstances.  The law firm counters

---

[8] The elements are discussed in the notes on use to CJI-Civ. 30:1 (2009).

that this element doesn't apply when the parties merely modify their fee agreement, as RegScan and the law firm did when RegScan decided to retain the law firm to commence litigation, and that this element applies only to flat-fee or contingency-fee agreements. (The parties' fee agreement called for payment on an hours worked basis.) Alternatively, the law firm argues that the fair and reasonable requirement was adequately covered by the included element that the fees were "reasonable in light of the services rendered."

¶ 49 We needn't wade into this morass. For even if we assume that the court erred in omitting the element that the fee agreement was "fair and reasonable under the circumstances," it's clear that any error was harmless.

¶ 50 The putative element in question pertains to the formation of the agreement. The nature of the attorney-client relationship dictates that the terms of a proposed fee agreement be fully disclosed to the client in advance and not contrary to public policy, and that the attorney use no undue influence to secure the client's agreement. *See Bryant,* 158 Colo. at 61, 404 P.2d at 523; *Rupp,* 147 Colo. at 22, 362 P.2d at 398.

28

¶ 51    RegScan doesn't even argue that there is anything unreasonable about any term or combination of terms of the fee agreement.  And though RegScan says that it was important that it be fully informed before it entered into the agreement, it doesn't identify any relevant fact of which it wasn't informed before it entered into the agreement.

¶ 52    We note that the fee agreement is a standard, clearly written, hourly billing based contract.  The law firm provided it to RegScan in full before any agreement had been reached.  Mr. Ertel, a lawyer, reviewed it and agreed to it without caveat.  And, of course, nothing forced Mr. Ertel to hire the law firm, or Mr. Tamkin in particular.  The client, RegScan, is a sophisticated business entity, not some "babe in the woods" unfamiliar with the legal system or the risks (and costs) of litigation.

¶ 53    Against all this, RegScan says only that it was vulnerable because it was facing "devastating" litigation and Mr. Tamkin was Mr. Ertel's friend.  But RegScan chose to sue BNA; it wasn't being forced into court.  And in any event, the fact a corporate client is faced with impending litigation hardly renders the client incapable of making informed, rational decisions about whether to retain legal

29

counsel, and on what terms. To hold otherwise would cast doubt on the validity of countless fee agreements.

¶ 54     As for Mr. Ertel's friendship with Mr. Tamkin, RegScan utterly fails to explain how Mr. Tamkin unfairly took advantage of that relationship in any way. The closest it comes is by referencing the $25,000 retainer and pointing out that the two friends communicated about the retainer by email. Yet, RegScan doesn't come out and say the amount of the retainer was unreasonable. And today there's certainly nothing unusual or underhanded about an attorney communicating with a client by email.[9]

¶ 55     In short, RegScan's half-hearted effort to portray itself as the helpless victim of a predatory law firm lacks any basis in fact. All relevant evidence in the record shows, overwhelmingly, that the fee agreement was fair and reasonable under the circumstances. It follows that any error in omitting that element from the elemental instruction didn't affect RegScan's substantial rights.

---

[9] RegScan also seems to complain that the amount of the fees billed exceeded Mr. Tamkin's alleged estimates. But it doesn't contest that the written fee agreement plainly says that "legal representations often involve variables that make it difficult or impossible to estimate fees accurately."

## D.     Exclusion of Evidence Under CRE 408

¶ 56     Finally, RegScan argues that the district court erred by relying on CRE 408 to exclude evidence — email communications between Mr. Ertel and Mr. Tamkin (or "information about" these emails) — that RegScan disputed the reasonableness of the law firm's fees and didn't admit liability.  Addressing this argument only as it pertains to the breach of contract claim, we reject it.

### 1.     Additional Background

¶ 57     The law firm moved in limine under CRE 408 to exclude certain emails sent between Mr. Tamkin and Mr. Ertel.  They included Mr. Tamkin's repeated requests for payment, and Mr. Ertel's repeated attempts to pay $200,000 and have the rest of the bill written-off.  The back-and-forth of the emails shows that, after RegScan had refused to pay the outstanding balance, Mr. Tamkin emailed Mr. Ertel an offer to write-off an additional $40,000 if RegScan would make a $200,000 payment by the end of 2012.  Resolution of the rest of the bill would wait until 2013.  Mr. Ertel responded, "Your offer is not close."  He then offered $200,000 "as a complete settlement for all monies owed by RegScan to Dorsey and Whitney."  Mr. Tamkin replied that he couldn't write off that much

31

of the bill, and said that RegScan could pay $200,000 by the end of 2012 and the rest ($140,000) in 2013.

¶ 58    The trial court concluded that the emails "fall within the scope of Rule 408 because a claim or dispute existed at the time the communications occurred."

### 2.    Standard of Review

¶ 59    As noted above, we review a district court's evidentiary decisions for an abuse of discretion. *Am. Guarantee & Liab. Ins. Co. v. King*, 97 P.3d 161, 169 (Colo. App. 2003).[10]

### 3.    Analysis

¶ 60    RegScan asserts that the evidence was relevant to requisite elements of both claims because both require that "the amounts billed were reasonable in light of the services rendered." But in the body of its argument, RegScan says that it needed the emails to prove that RegScan disputed the bill — an element of the account-stated claim, but not the breach of contract claim. (To

---

[10] The parties dispute whether RegScan preserved this issue, but we needn't decide if it did. It hasn't escaped us, however, that, at trial, RegScan's counsel said he wasn't "interested in using those emails as exhibits. I'm happy to pass that up." He said he only wanted to have Mr. Ertel "testify about the fact that he objected to the overall reasonableness of the fees at the conclusion of the litigation."

prevail on its account-stated claim, the law firm had to prove there was "an agreement that the balance and all items of an account . . . are correct" and that RegScan promised to pay such balance. *Mace v. Spaulding*, 110 Colo. 58, 59, 130 P.2d 89, 89 (1942).)

¶ 61    While both claims include a reasonableness element, proof of the breach of contract claim doesn't depend on RegScan's subjective perception of whether the fees were reasonable. Rather, the reasonableness of the fees is an objective inquiry. *See, e.g., Payan v. Nash Finch Co.*, 2012 COA 135M, ¶ 18 (using lodestar method — the number of hours reasonably expended multiplied by a reasonable hourly rate — to calculate objective fees "carries with it a strong presumption of reasonableness"); *Krone v. State, Dep't of Health & Soc. Servs.*, 222 P.3d 250, 257 (Alaska 2009) ("the proper approach to determining actual reasonable fees is to *objectively* value the attorney's services") (emphasis added). Thus, the evidence was arguably irrelevant to the breach of contract claim. Because we need only affirm the verdict on the breach of contract claim to affirm the judgment, we needn't go any farther. *See Rush Creek Sols., Inc. v. Ute Mountain Ute Tribe*, 107 P.3d 402, 406 (Colo.

App. 2004) (appellate court "may affirm the trial court's ruling based on any grounds that are supported by the record").[11]

¶ 62　　But in any event, at least as to the breach of contract claim, the district court's ruling that the emails were subject to CRE 408 was correct.

¶ 63　　CRE 408(a) prohibits the admission of evidence concerning offers to compromise "when offered to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount." In determining whether a statement is inadmissible under CRE 408, the "thresh[]old question is whether the conduct or statements were made in settlement negotiations." *Aaron v. Marcove*, 685 P.2d 268, 270 (Colo. App. 1984).

---

[11] We observe that Mr. Ertel testified about his strong concerns that the law firm was billing too much during the BNA litigation. He complained to Mr. Tamkin about the "unbelievable cost overruns," told Mr. Tamkin that he was relying on Mr. Tamkin's earlier estimates, and told Mr. Tamkin that he wouldn't have hired the law firm if he'd known the BNA case was going to cost so much. In other words, Mr. Ertel made plain to the jury that he had complained about the reasonableness of the fees during the BNA litigation. So RegScan was in fact able to introduce evidence that, at the time the fees were incurred, it didn't think the fees were reasonable.

¶ 64    During the time the emails were created, the parties disputed the amount owed and were exchanging offers to resolve that dispute. And RegScan's ultimate reason for wanting to introduce the evidence was to defeat or minimize liability on the law firm's claims. That's classic CRE 408(a) stuff.

¶ 65    In short, the district court didn't abuse its discretion in excluding this evidence (at least as to the breach of contract claim).[12]

### III.    Conclusion

¶ 66    The judgment is affirmed.

JUDGE HAWTHORNE and JUDGE RICHMAN concur.

---

[12] We don't address whether some of this evidence would be admissible to defend against an account-stated claim; specifically, to show that the defendant didn't agree to the amount claimed to be owed.